Thank you. Thank you. The next case called for oral argument is Ware v. Wi Wi, Inc. Counsel? Good morning. Good morning. I'm here to represent Fred Ware, my client, my friend who I think is separate, and justice. I'm not here to review the character of the jury, I'm here to represent the judge. You know, just recently we've all seen the video. Apparently, by everyone's account, wonderful. Two outs, the guy's pitching, perfect game. The batter hits the grounder, the pitcher picks it up, shows that the first guy is clearly out. And the ump blows the ball. And he clearly made a mistake. I didn't make a mistake because he was against one side or toward the other side. But those are the sort of things I think that happened in this case, and that's why my client suffered an injustice and we need to correct it. This is a case where the facts really are not in dispute. My client goes into the bar, he gets shot by a patron in the bar who shouldn't have been in there to begin with. And I want to talk about the law of admissions, and I also want to talk a little bit about jury notification and why I think this jury got this so clearly wrong. I mean, the two most shot people in the courtroom when this jury came back were my guys. Because the facts were so overwhelming. Wee Wee Inn ran a place in Venice, Illinois called Ace's Bar. And it's owned by a husband and wife, and their first cousins were security. And the, Derrick Williams, who was one of the owners, as a very matter of fact, he testified twice at trial and once to his deposition. But Fred Ware was a great guy. He was a great customer. We never had any problems with him. Never caused fights, didn't get drunk, and had an accident. And he recognizes that his first cousin was killed at a bar in Venice. Something stupid, a small fight inside, they walk outside, a guy gets shot. And he recognizes that if you're going to have a bar in Venice, you need to provide security. And you need to provide security twice. He's telling the jury this, not once, but twice. And so when he opens his bar, he wants to make sure there's adequate security. Because you need it. And what he says is, if you don't have security, it's dangerous. And obviously, guns and alcohol don't mix. And so in Venice, they really needed to try to address security. And they did. They bragged about the fact that before this night, which was the last night that this particular facility was going to be open, nobody got injured in the bar with a weapon. And why? Because Derek Williams said that the way we had this bar set up, you couldn't get in if you had a weapon. The hallway was not much wider than this, than this tape right here. It was very narrow. You came in one door, you had two who was there to check the men, Harley was there to check the women, and they were to check for guns. And they had wands. The city, the police gave them a wand for weapons. Here, use this. It was so good, they bought another one. But this night, they don't use the wands. They had a rule. One and done. You try to get in this bar with a weapon, you're barred. You can't come back. Little Larry and Ghetto, they testified, were troubled guys in the hood. They were known to carry weapons. They tried to get in that club a number of times with weapons. Nonetheless, they get in the club that night. Fred is there for a birthday party, there's a cake. Ghetto comes up, he wants a piece of the cake. Fred Ware's girlfriend says, we haven't cut it yet. And so, Ghetto takes the table and puts it. So, of course, Fred Ware's girlfriend starts talking to this guy. He calls her a bitch or something like that. She slaps him, and he slaps her. Now, so Fred Ware is seeing this, so he goes to stop this guy from doing anything further. The uncontradictory testimony is that he's not throwing punches or anything. He's kind of arresting the guy to keep him from doing anything else. And shots were fired. Do we know who fired the shots? Do we know who fired the shots? The testimony was that he believed it was Ghetto, but we do not know who fired the shots. The only evidence was that Fred Ware testified that he was not armed himself. But the significance of that question is this. If we don't know who pulled the trigger, what we do know is there was a gun in the bar. Well, and then the second follow-up question is, do we know how that gun that fired the shots, or from which shots were fired, do we know how it got in? Do we know how it got in because the person wasn't wanted? Well, what they said was, there's only one way in and out. Now, there's a system, they said, that Mike Townsend had developed. Well, yeah, there's a way. You could violate their security system by passing through a window without a screen. But as the Vaughn case, they say, suggests, if you can point out your own flaws in your own security system, that's evidence that your security system wasn't accurate. That's like saying, well, you know, this street is full of cops. You'd never be able to shoot anybody here. If I was going to shoot the president, I'd go up there. The school book depository, about 6'4", up there. There's nobody up there. Well, that doesn't suggest that that guy was in charge of security. He knows here's a safe room. You could do real damage if you go shoot up there. So by saying, well, yeah, maybe we can get in through there. But these guys get in, little Larry and little Larry and Daniel get in the bar, and we know we're there, and Ulysses does not testify that he searched them. He doesn't say, I searched the guys who didn't have a warrant. And your proposition that the defendant has a duty to search? Absolutely they have a duty. They have a duty to search? Absolutely they have a duty. They have a duty to use the wand? They have a duty to pat them down? They have a duty to strip them? They have a duty. How far does that duty go, and what is the parameters of the duty? The duty is that they are to use reasonable care to prevent, because they were all noticed that in Venice there were problems with guns and slugs. Was there any search at all of any of the patrons that evening? Fred Ware's girlfriend testified that when she came in, she was cancerous. The only testimony on the subject was that at about 10, 10.30, Tooth and Harleen Wilson started working the doors in search of the customer. But they did not, there was testimony that one of them had taken a break for a while, and there was also suggestion that this was the last night, and that near the end that security started with partying with some of the guests. But their duty is that they have to be diligent, and by their own testimony. Not only the husband's testimony, but the wife's testimony, and Tooth's testimony. If they ran their system, nobody gets in the gun with the club. The other thing I point out about the woman's bathroom, the woman's bathroom, here you have this narrow hallway. It's right here. The door comes in and there's a turn, you have this narrow hallway that everybody has to walk through. You either walk through here, or you want to go to the restroom, it's right there. You just can't hide from the checkpoints. So, I mean, they said that if they enforce their rules, their policies, nobody gets in. They also admitted, Tooth admitted, when I had the wine in my hand, I'd see people come up, they'd see with the wine, they'd turn around and leave. So it was a very effective deterrent. I mean, nobody on the defense side suggested that their security system that night was accurate. In fact, when the event happens, as soon as it happens, the owner of the bar admonishes the security guy for doing a bad job. It's your fault there's a gun in this club. This shouldn't happen. So, you know, the burden of the plaintiff never changes, in the sense that what Fred Ware had to prove by the comments of the evidence was that he was an anti-T, which he was, that they were on notice, that it was not unreasonable or unforeseeable to think that somebody would try to get into the bar with a gun. By their own admission, they knew these two patrons that came in and started a fight and were in a fight had tried to get in the club with guns before. So we proved that. No one contradicted that. Was there an approximate cause instruction? Yeah. Well, he gets shot. Standard IPI. Yeah. It's all standard. Nobody objected to it. The jury had determined that the approximate cause was the shooter and not the failure to... But that's not the law. That's not the law. The law is they had a duty to protect. Because they were on notice, they understood what was going on. They had a duty to protect their patrons against the criminal acts of third parties. Now, Ghetto, by the time he ordered the trial, was dead. The Lubbock brothers, little Larry and his brother, they were both in jail on something else. And so they didn't appear. And obviously, the gunman is responsible for pulling the trigger. But the bar is as well. The bar is liable because their security could have prevented this criminal action from happening inside the clubs. And this is a party atmosphere. They don't want to... Yes, sir. Didn't the public counsel raise something in the brief about that this may have all occurred, the actual injury may have occurred outside the building? Do you want to address that argument? I'd be happy to address that argument. Because here's what happened. The only... I'm going to tell you why Mike did a great job in this case, because he had so little to work for. In fact, I reminded him of a case when I was here in a different capacity. A lawyer was here. A jury had only awarded the person with medical nothing for pain and suffering. And the defense lawyer said, well, you know, Your Honor, I did a good job trying this case. And Justice Donovan, in his very disarming and charming way, said, you made them do a good job in trying this case. And I think that may be the fact here, because the evidence... You had one woman who claimed that the whole time she was at the door. And what she said was, this is Harlem. They're secure. There were definitely two shots fired in the club. They were definitely up where the dance floor was. That people started to scatter. Here comes Fred Wicker, limping. He falls. He says, I've been hit. He's helped out to his car by his girlfriend. They immediately get in the car and leave. Did they order? No. They got in the car and leave. And the timeline is very, very interesting. Because when two calls at 2.20 a.m. to report shots have been fired, Fred Ware has already been checked in at the emergency room two times more. Three minutes earlier, at 2.17. So the evidence is Fred Ware... People didn't believe a word Fred Ware said. Their own people have shots fired involving Fred Ware. Fred Ware limping out of the state of Kentucky. When the police come, the police ask Toot, what happened? And Toot says, well, there was a fight at the bar and shots were fired up here. The police officer comes in and testifies that right here on the dance floor, we find gun casings. Derek Williams was with them and said they found two gun casings on the dance floor, right where Fred Ware was. And the police officer said, I smell gun smoke there. The very specific and well-known scent that police know... He picked it up from me and said, this is gunpowder. There are shell casings found inside. There was arguments made about something being outside, but nobody investigated outside. Nobody testified they found any shell casings outside. And Harleen Wilson says, I watched him from the moment he left the club to the time he got in his car and drove off, and there was no gunfire. And they didn't hang around? They just didn't? So that could not be. I mean, that's how desperate the defendants were to try to win this thing. Now, I will say, for Mr. Williams, Mr. Williams was recognized. It was one of the reasons I was surprised Jerry knew what they did. Mr. Williams did not come in here and say, hey, I didn't do anything wrong, we didn't do anything wrong. He was very matter-of-fact about it. Look, Fred Ware got shot in our club and he should have been shot. It's our fault. I don't think he said it's our fault, but he said he would have been shot had we done our job. We could have protected him. And Fred was a good customer. And we wanted to protect our good customers. We needed to protect our good customers. People in there, they have a party and a good time. We don't want people to stand around looking to see this guy got it done. They do want to have some sort of violence in their club. So they create this atmosphere. You don't have to worry. This is the safe haven for us. We've got people at the door. Nobody's going to get in here. So enjoy yourself. Relax. We'll take care of that. But do you have any other questions on that line of questioning? You know, I thought for a long time, why did this jury get killed? You know, they were all white, but ultimately, you know, Fred Ware, you know, dreadlocks and everything. But I don't think it was not a racist murder. But what was really telling to me and where I had that ah-ha moment was the other day. I was in line at the gas station getting coffee. And there was a headline. Whoever was in the front of the line couldn't find their card or whatever. And four or five people were there. And, you know, if you go to the people before work and see the same people because they're on the same schedule as you are, and they're talking about a headline. Seven shot Metro East over the weekend. Now, in Delaware, when you see a headline that says Metro East, that means, black means, Venice, East St. Louis, Centerville, Gallatin, Washington Park. And I was struck by, in the discussions of these young kids that were shot, some were killed, how desensitized these people were. It was very maddening. And it was very clinical. And why it struck me so much was about a month before, I was in the same line and they were talking about two young girls who were killed when some police officer was flying down the highway at 110 miles an hour and he was text messaging his girlfriend. He was looking on something on the map. He crossed the sign line and killed her. And the people are saying, the poor parents and the poor mother. And I realized, for a lot of people in Metro East, and I think this jury, a lot of them have become desensitized to violence in some of these communities. And there is this kind of assumption of risk. Now, of course, assumption of risk is affirmative defense. And there were no affirmative defenses in place. There wasn't assumption of risk. What's the defibrillatory mechanism? The bar is used, but it wasn't the law. Well, you know, you're a bar defense, but heck, you should have been ready for gunfights, knife fights, whatever. That's not the law. But I think that that was an attitude that kind of pervaded this jury, that somehow, yes or no, if they can be callous and indifferent to young kids dying, well, that's funny, you just got shot in the foot. Now, shot in the foot, crippled for life, a lot of pain, and 100,000 medical later, you know, this guy is going to this jury saying that, you know, I've suffered injustice. I have a right to recover this case. And I think, in fact, that he does. I don't think the facts. Unless you really go out of your way to dream up strange and obscure and tortured fact sequences to try to justify the jury's verdict, you can't justify the jury's verdict. I mean, obviously, I knew going into it that they were going to be worried about, you know, there's over 100,000 medical. That's a starting point. It's a time where every 401Ks are tanking and the stock market's down. And I understand that they were going to have a problem with damages. But I tell you what, if the jury would have come back with 2,000 medical or something like that, I would not be here. I'm not a sore loser. I've tried a lot of cases. You win some, you lose some, all right? But this is an injustice because they said no. They said no on a question that the evidence simply did not permit them to say no. It's not a matter of opinion. It wasn't a closed call for a case that far. Thank you, counsel. Counsel? May it please the court, my name's Mike Constance, and evidently I'm the luckiest lawyer around. Forty-three years ago this week, I was walking down the hall in Belleville in the courthouse, and Paul Whiteman, who was a clerk at that time, grabbed me and said, Judge Cunningham wanted to see you. And I went in, and I'd never met Judge Cunningham before that. And he said, what do you want? And I said, well, I understand from your clerk I'm supposed to defend the case in ten minutes. My point of this is what Judge Cunningham said to me. Why are you here? Gentlemen, the reason why we're here is Patrick McCarthy charged the expert that meant nothing to this case, charged $910,000. That's why we're here. Let me explain. McCarthy, who has all kinds of credentials, taking care of the 20-year cop, take care of the Pope, the presidents, his security company, fine. And he's describing how bad everybody knows this. I assure you one thing, have your clerks look at the record. I didn't say one word about being in my establishment that was reckless, willful, stupid. Or you assume the risk. I never said anything like that, and I wouldn't. I didn't have to, actually, based on what the expert said about the neighborhood. But you know what the expert said? He could not find one thing in reviewing all the police reports about any abuse or shootings or knifings or beatings or anything inside. Wee-wee. And the reason was they had security from the beginning. I think they established this place in 2000. Now, this was the last day of business because Route 3 was being expanded, so they had to close. And I placed center at Milligan. Our security guard, my right guard, looked just like the security guard. And this is one thing you honors on do not see is what the people look like and how they testify and their demeanor and everything in this case. My right guard's name is Tank, and he looked like a tank. And that's exactly what Ulysses Williams looks like. He looks like a tank. He's twice as white as me and about this high. And the jury saw him, and they knew that he meant business. And they knew that he was an excellent security guard, not some bum as the plaintiff's trying to put out here before you. But Harold M. Williams was just as big, the female security guard. And she used the wand, and she checked everything. And that's the testimony. And the testimony of his nickname is Toot. The testimony from him is...  Wait a minute. They testified they did use the wand? Yeah. She used the wand. He pat it down. He did not trust the wand. On this particular night? Yes. Absolutely on this particular night. And while I'm thinking of it, when she had to go to the bathroom, her sister, Sean Bell, who's one of the owners, Derek's wife, she went up and checked the females that are coming in. And do you know the only person that said that there was no security that night was Miss King, Fred Ware's girlfriend, who was two months pregnant at the time, who came in with her three sisters. And guess what? She'd been there three or four times before that. Yes, I was either patting down or I was wanding. But this particular night, I wasn't checked. You're starting to get the flavor of what the trial judge saw. She saw the witnesses. She saw their demeanor. She judged the credibility. The thing that I was interested in before I go on, though, on the jury nullification and what's going on in life and things like that, there was nothing in the post-trial motion about that that could have been looked at by the trial judge if counsel thought that was so important. That's not part of this record or anything. I am astonished. Twelve good citizens gave three days of their time to listen to the evidence. He filed a 10- or 14-page post-trial motion reviewing every minute of the case. Judge Prater issued a three-page order going through the things that he raised. She sat there. She saw all these witnesses. She saw Fred Ware. Fred Ware told the doctor, I can't do hair anymore. Hadn't done hair for 18 years, according to Springfield. That's what this case was about. Oh, I couldn't ride my motorcycle anymore. Well, everybody in town saw it, including Miss King, who rode around on the back of a motorcycle after she had the baby. That's what this case is about. Fred Ware came in, to my knowledge, based on the testimony with six other people. And Miss King came in with her three sisters prior to when he came in with six people. None of those nine witnesses were caught. I didn't even comment on it. If you want backup for what you're trying to say occurred, don't you bring in these witnesses? All hell broke loose, as you heard, when you look at the record. When a noise broke out, they weren't sure whether it was shooting outside or shooting inside. But what the record shows in this case is whatever this bad person that only Miss King says turned over the birthday cake that she brought in for Mr. Ware that night, and that he called her a name, and she slapped him. And who's over there immediately? Ware starts a fight with whoever this fellow was, and believe me, there was some question as to who's rolling around on the floor with Ware, fighting before the thing broke up. But Derek Williams is there trying to break them up, the fight that Mr. Ware started. We have no idea. There is not another about who possibly did the shooting in this case. The two individuals that the plaintiffs would like to cast aspersions are were right down in jail and subpoenaed to the sheriff, and they're right there. Does it make any difference who pulled the trigger? Honestly, no. So, I mean, we don't really care who shot who. No, it doesn't make any difference. I'm just pointing out things could have been done a heck of a lot different than indicating these were probably the shooters, ladies and gentlemen, because they were bad guys. But do you know what Judge said that night when they came? He knew they'd been refused service before, that they'd been refused entrance, and what did he say? I double-checked them to let them in. I'm not stupid. I'm not an idiot. The jury saw this testimony. They saw Herlin Williams testify. We checked everybody, the expert. I asked him, when you went over, you found out that there was a window here, and it is in this post. The security guard's up here. The bathroom's around the corner in the hall, or anybody could have looked. Now, the issue on negligence and ordinary care are pretty good and correct. As opposed to the case before us, there was no objection, I think, by either of us in this case. I don't remember. I know I never made an objection to either of the others or the instructions because it was clear, and I wasn't surprised what happened here after Ware testified about he did hair and he could no longer do hair and he never rode a motorcycle and he's riding a motorcycle around, and Ms. King's demeanor. And the judge, the trial judge, saw all this, and she could have corrected this early on in this case. But as I argued to the jury in this case, and many of them that don't get down here, you don't have to have perfect security. You only have to have reasonable security. And it's what you do or not do. And it was painfully obvious from Gary and the two security people and Sean Young who would relieve her sister that they did the best that they could in protecting that door to try and keep weapons out of the thing. And now it is not clear at all about whether he was shot inside or outside. And the reason I brought up Ms. King's sister, the record is clear from her testimony that when they got in the car to go to the thing, and by the way, the car is full of all of this blood, her one sister went with her, and the sister wasn't brought in to testify that he wasn't shot outside. All heck broke loose. Nobody, I mean, you can imagine everybody was shot outside, inside, people running for the door, the lights being turned on. The issue comes down, as I saw and as I argued it to the jury, at this time it's for the jury to decide whether my clients exercised ordinary care. And ordinary care is what a reasonably careful person would do under the circumstances similar to those shown by the evidence at that time. The law does not say how a reasonably careful person would act. We leave that to the jury to decide. And that's, gentlemen, why I wasn't surprised about this verdict. I was surprised about one thing, that it took about 40 minutes. I will admit that, but I wasn't surprised about the result. Judge Crowder, and I don't know at that time, her bailiff told me that they tried about 20 cases. She let us argue three times as long as you're going to let us argue on a post-trial motion. And then she took, I think, about two months to write her three-, four-page order. I don't even remember what it was. But she asked questions like you do. She was, I've never seen a judge better first on what happened in a case. And as I described, these people and everything like that, that's what you miss. And their demeanor and the way they testify and the way they come across. And this verdict should not be disturbed. Thank you. Thank you, counsel. Counsel? Thank you. I take my statement fast, very seriously. And I know that it's important that we make a fair representation to support what the facts are. You made smart moves. But you didn't correct any of them in my statement, thanks. I point out in Record 142, Harleen Wilson, neither she nor Ulysses were using the security wire. Ulysses didn't testify that he checked these guys twice that night. He didn't. He didn't testify to that. Mrs. Williams testified that she summoned her husband, Derek, to get back there with the cake. Because go back there, knock the cake over, and start anew. Alright? Now, we've all tried lawsuits. You don't bring in five witnesses to prove something that's already been proved. I could have brought in six people. I could have made this a 10-day hearing trial. There was no need to do it. Because I knew from the deposition testimony before trial started that they were going to offer no evidence that suggested that Fred Ware was a child. That he was a child himself. And that he wasn't shot that night. The doctor has him separate a boulder for me. Right there in his foot. To the ankle and to the foot. We're going to assume that this guy had the forethought, I might go into a gun battle outside. So I'm going to limp out and say that I was shot in this leg on an off chance that I encounter a gun battle outside and I get shot in this leg. Not in this arm, not in this shoulder, not in my side. It's ridiculous. Mike Peniston started off his opening statement by saying there was a 20-minute running gun battle out in this parking lot. Well, they have a duty to make sure the parking lot is safe too for its customers. So I wonder about the legal significance of that. If Mike and I had been shot out in the parking lot. Now there was evidence that they hadn't had any shootings inside. There was evidence that there had been a lot of shootings outside previously. And people shooting up the place from the outside. So their security was completely lax when it came to their customers on the outside. The testimony was that people, when gun shots started to be fired, they didn't come from outside and run into the building. They were inside the building and they ran out. Why would you run out into a gun fight outside? You wouldn't. I mean, it's just ridiculous. Let me ask you a question, Mr. McGinn, about the wand issue. I was kind of under the impression from reading both briefs that there was really no dispute and that the wands were not used that night. Is there any dispute in the testimony about that? There is no dispute in the testimony. None. And Tootie, by his own admission, said that he didn't use it. Toot never used it. I'm sorry, but he never did. Okay. And what was my point? The police give it to him. Toot says they're effectively determined whether he was using the wand at the time. His testimony was he saw him all the time. When the wand was out, people would walk up and they'd see the wand and they'd turn around and leave because they had weapons on them. I mean, I'm just trying to pin this down. Your argument is that the testimony reveals that she didn't use the wand either. That's correct. She said that night and neither were using the wand. There was also uncontradicted testimony. See, they had this, well, we start about, the club opens at like 5 o'clock in the afternoon. But security didn't roll until 10, 1030 because it's a different crowd. So people would come after that. That's when they'd start worrying about it. So there's no security before that. This is not a question of, oh, we had a great security system in place and somebody hacked our system. Somebody really clever hacked our system. This is a situation where they said, we've got a system in place which includes using wands which are an effective deterrent and we didn't use them. We have a system in place that says, if you try to get in our club with weapons, you're done. One and done. Two testified that. That was the policy of the club. Let's assume somewhere in the record he does say, yeah, I saw them come in the club that night. He didn't enforce their own rule. Because he said, oh, lots of times. Lots of times they try to get in our club. And they were trouble in the neighborhood. Those guys. Not Red River, but those guys. Thank you. Thank you, Counsel. We appreciate briefs and arguments. Counsel will take the case under advisement.